May it please the Court, Stephen Cullen and Kelly Powers appearing as pro bono counsel, Your Honours, on behalf of the appellant and cross-appellee. We represent Mr. Asumadu, who of course is in Canada. Your Honours, of all the circuits in the United States, the Ninth Circuit is fortunate to have what really is considered the principal case on the analysis of the key two words in this very important treaty, habitual residence. And it was this court in 2001 that laid the groundwork for a modern interpretation of those terms. Now, what has happened over the years is that this case, the Moses case, has been attacked both internationally and within the United States. But that is when a narrow view of the Moses case is taken. One has to read Moses several times to get it. It is a complicated analysis. But what the then Chief Judge did was explain that first one looks at whether parents had a shared plan, a shared intent to relocate children from one nation to another. But in certain circumstances, and we say in our briefs in this case, there are other analyses that a court must make because the whole notion of habitual residence is founded in common sense and the ordinary interpretation of those homes. So when we consider what happened in this case and juxtapose it against the prime directive of this treaty. Let me interrupt. I think I have a sense of a lot of things that happened in this case. But let me ask you a question that puzzles me. Yes, Judge Walker. As far as the daughter is concerned, the district court held that there was no shared intent for the daughter to reside in Canada, but did not consider whether she was acclimatized to be a Canadian. Is that not a legal requirement that if you do find that there's no shared intent, which I think is probably correct, that you still have to decide whether or not the daughter was acclimatized? And that issue was never addressed by the court. Do you think the court had a responsibility under the law to do that? We say yes on page E11, as you say, Judge Block. I believe at line 16 of page E11 in the transcript, in the extract, is where we say the judge respectfully should have inserted an acclimatization analysis. When I looked at the transcript of the argument before the district court, it wasn't argued. That issue wasn't argued. Acclimatization was argued as to the son, but I didn't see it being argued as to the daughter. Is there somewhere in the record where they raised the issue that notwithstanding the parents' intent, or even if the parents' intent is not clear, the daughter was acclimatized? Yes, Your Honor. So, by way of example, I believe it's at page 53 of the record extract, the excerpts, I should say, that there's discussion that both children were now settled in Canada and receiving the Canadian National Child Benefit. So, she's acclimatizing there. So, did your client argue that notwithstanding evidence of intent, because the district court found that the evidence showed that the evidence was that it was only a trial to go to Canada. Did your client argue, or did you argue that notwithstanding that indication of parental intent, she was nevertheless acclimatized? Yes. I saw some general discussion about acclimatization, but not an argument to that effect. And you're saying page 53 of the record? By way of example, page 53 talks about the child tax benefits. There's testimony from Mr. Asomadu that the child was going to school in Arizona, that they live in a three-bedroom home in Arizona. You mean Canada, right? Excuse me, that three-bedroom home in Canada, that they live in Canada, that both children go to school in Canada, that there is extended family in Canada. There was testimony as to that, from which you could make an argument about acclimatization, but was there actually an argument made? And if so, where? Well, there was no opening, or do you mean by counsel to the court? No, that was made on the proposed findings of fact and conclusions of law, because the lower court rightly expedited this matter, and the court gave us two hours each, and we were in a rocket docket situation to have this case heard, to ensure both sides had counsel, both sides ended up with pro bono counsel, and to advance this matter in accordance with Article 11 of the treaty. But am I correct or not, I may not be correct, that the district court never passed upon the issue, however you pronounce that word, acclimatization? I have great difficulty with that word, and I did not, did not ever address it, and we say under Moses... But it would be your client's burden. I think what Judge Ikuda is asking is a troubling issue for you, because wouldn't you have to say to the district court, we're trying to make two points, one point is that there was joint intent to stay in Canada, and our second point is that she acclimatized to Canada, when we're talking about the daughter, and if you don't ask the district court to make a finding about acclimatization, then why haven't you waived that part of Moses? Oh, well, we didn't, we didn't waive anything, Judge Friedman. The averments about acclimatization are leeching in our verified petition. Over three pages, it is laid out the legal basis for acclimatization, starting at paragraph 26 of the verified petition, and going all the way through in the excerpts, you'll find that starting on page 242, starting at paragraph 26, the mother's Canadian immigration application was granted in 2016, jointly planned for years to relocate to British Columbia. But parental intent, I think your argument that you were starting with in talking about Moses was that parental intent is a separate question from acclimatization, that the judge had to do it, acclimatization separately, but where, where did you make a legal argument that you, that the judge had to do that? Well, we make factual averments in the verified petition, starting, as I say, at page 242, paragraph 29, and it runs right through to paragraph 41. Those are the factual predicate for an acclimatization case under the second approach of Chief Judge Kosinski in Moses. It lays out, they settled easily into the family home, participates in school, the whole family lives in British Columbia, they attend church in Canada, they receive medical care in Canada, they're fully involved and immersed in day-to-day family life and cultural life in Canada, and have been for nearly all of their respective lives. That is classic acclimatization. Well, the daughter wasn't there for most of her life. Well, she was there for about a third of her life. When the wee girl went to Canada, she was about four, and she stayed there for 16 months. And remember, Judge Friedman, no one was going back to Georgia. Georgia had been abandoned completely. Do you have any case that says we need to look at states within a country, though? I thought this was really about which country. It is about which country. But when you talk about abandonment, one has to look at the status quo ante, where are the mother and the daughter living? They were living in Georgia, and then they waited, by American standards, a very short time. They waited about five years for the mother to get her permanent residence card to relocate to Canada. And then they relocated to Canada. Your time is moving on, and I have a couple of other curiosities. Your position is that the daughter should be in Canada, I take it, right? Yes. All right. And when I read the court's decision, it seems as if the court did not pay any attention or consider the issues of the woman's cultural background in Ghana and disregarded that completely, as if it was not a factor. It seems to me that perhaps that should have been part of the totality of factual circumstances that should have been considered. She gave a lot of reasons why she went to Canada and what happened in Canada and and a lot of that was predicated upon getting counsel from the tribal chiefs back in Ghana. I'm just wondering whether or not these cultural norms should be a factor that should be considered in these types of cases. I haven't found any case law on it one way or the other. The district court did not cite anything, did not seem to consider that. Do you think that was error? Respectfully, Judge Block, no, we do not say that that is error. There was, as you say, substantial testimony about the elders advising the parties and trying to assist them. But what one looks to in these cases is the matrix set out in the treaty. And the treaty says, does the father in this case have rights of custody under Canadian law? And one is directed not to look at Ghanan law or Scots law or Irish law to determine that. No, but she gave reasons why she came to Canada and why she cooperated and the passport situation and all this type of stuff. Those are factual matters that I think ought to be considered by the court. Is there any case law one way or the other that addresses the issue of whether cultural norms should be a factor in the considerations? Not within the context of the Hague, because there isn't a Sharia country that has become a state's party. But I agree with you, Your Honour, if there was a situation where, for example, Sharia law was being considered, that would be relevant because of the different values put on it. Sharia law, that was handy, but seems to go a long way towards her she came to Canada and the dynamics between her and the relationship just seems to be such a central factor for consideration. Well, it was considered. I mean, there was a lot on it. I understand you're saying that there should be more, but ultimately one has to look at the facts on the ground and the facts where the plan was clearly, wait for the permanent residence card to come through for Canada and then move to Canada. Now, the judge says, well, there was no intent, this was a trial period. But if you compare, for example, the Murphy v. Sloan case to this, you can see why acclimatization is so important. But we can't look behind the District Court's credibility determination, right? Is there anything that would make that clearly erroneous? The District Court found that there was no shared intent for the daughter to testimony. He credited it. He credited that. So is there anything that we would look behind and say that was a clear error? Well, you do look behind it in these treaty cases because it is a de novo review. And although you can say- For the facts? I mean, we certainly look at de novo at the legal issue. Yes, but at a certain level, an analysis of habitual residence is also always a legal determination. So it's a mixed question of law and fact. But as to his findings of who was more credible as to whether it was a trial period or not, I think we would have to find that to be clearly erroneous. Right. Because he credited the mother with certain issues and credited the father with other issues. And I'm very aware I only have two minutes left. I do want to try to save- You want to save that for rebuttal? A minute or so. I have another curiosity. Yes, Judge Block. You want the son, obviously, to stay in Canada. Yes. And my understanding is that the district court did not consider relevant or did not consider whether there could be a risk of harm to the son by reason of the alleged spousal abuse. He did find that there was spousal abuse. I think that's an issue of law, whether or not with that finding, the court was obliged to risk of harm to the child. Yes. And the court apparently thought that was not relevant a consideration. Am I correct about that? Yes. On two grounds. First of all, there was a joint expert appointed, Dr. Stahl, who said there was no grave risk. That's on the facts. And second, Judge Kuczynski had explained in Moses that you have to find extreme, extreme harm. That's the they said that we're only looking for the period during which there would be a custody determination, so a short-term period. And so did- I don't know that the court considered it temporally, did it? No, it did not. But Mr. Asumadu had put forward certain proposed undertakings in his prima facie case to address any concerns that ultimately the judge had. What do you think the law is? Should the risk of harm to the child be a factor to be considered by reason of the spousal abuse? That's a very difficult question, because if you take a broad view of that, then you are essentially neutralizing this treaty. This treaty is here because we trust our states, parties, nations- There's an issue of law here that I'm concerned about, whether spousal abuse is ever a factor in considering whether the child is at risk of harm. It may well be, on a particular factual record, that the answer to that would be no. But is that not the law that the court is required to consider, that if it makes a finding of spousal abuse? Well, you're not going to like my answer. It depends on the facts, because it is a nuanced approach that- There's been no determination. As I read the district court, the district court did not consider that to be the law. No, the court found that there was no grave risk of harm to these children. But they did not really address the issue of whether or not the spousal abuse should be a factor in that consideration. I thought the district court did find some abuse. They considered the severity of it and said it wasn't aimed at the children, so there was some Just as in really the classic case on this, Whelan versus Lynn, First Circuit case, where there was some weighing of one incident from the father to the mother. But there was no situation here where we have post-traumatic stress disorder, no clinical findings by the jointly appointed independent experts. And remember, the lower court had the experts' written report in this case. It may well be that from a fact finder's point of view, they can find that there's no grave risk of harm to the child. But I think there's an underlying legal issue, unless I have this wrong, that the court should consider that once it makes a finding of spousal abuse. And the law seems to support the fact that that is a factor that the court should consider. Am I right or wrong about that? You're right on that, and that's why we have undertakings. That's why, if there is some concern, some pause on the part of the lower court, the court can insist that the plaintiff petitioner advance undertakings, so the court is satisfied that Canada, and we're talking about Canada here, can deal with this case when everyone goes back. And remember, Exhibit 14, Your Honours... If there was a finding of risk of harm, as I understand the Hague Convention, I deal with a lot of these things back in Brooklyn, by the way. Yes. Is that if they find that there is a risk of harm, then the court has to consider whether Canada would have means of assuaging it or dealing with that issue. I understand that. But what I'm puzzled by is there seems to be a circuit split on the underlying issue of whether or not spousal abuse triggers an inquiry as to whether or not the child can be adversely affected emotionally or psychologically. And I think there's a tension between the First Circuit and the Eighth Circuit, and I think the Supreme Court has said something about that also. Judge Block, I agree that there's a split on that. There's a split on habitual residence. There's a split in our sister states and sister circuits on basically every key point in this treaty currently. Here, it seems that the wife has said she would not go back to Canada no matter what, as I understand the record. So does that take this out of the circuit split or not? How does that affect whether this question of the kids' harm from the spousal abuse? That's a very good point, Judge Friedman, because Madam Respondent did say that very early on in her testimony. But when we, I do have to point out, when we appeared for the show cause hearing, Ms Powers and I implored the lower court to appoint counsel for her. And if that caused some brief delay, so be it, because it was vital that she had excellent, excellent representation, which she does. So yes, she said that, but we don't know if it came down to it and if the court actually said, I'm going to order a return, but I'm going to allow the mother the first option to return with this daughter, whether she would avail herself of that, because the court never got to that point. We've taken you way over your time. Way over my time. Well, we'll give you a minute for rebuttal. Lovely, thank you. We'll hear from the other side. Good morning, Your Honours. David Yohannan for the with me is Scott Clunt. May it please the court. I'd like to start by diving right in on the question of acclimatization. And I'd like to try to dispel maybe some confusion and start from the back end, which is, can acclimatization alone supplant other evidence? Can it carry the day? And I think, and I know rather, when you read Moses, it's at the conclusion of Moses where you get the answer. And the answer is that you cannot simply ask whether the children had in some sense, quote, become settled in, in the new country. And I think it's clear when you read Moses that what is meant by settled in is acclimatization. So the court very clearly and expressly warns away from using acclimatization as the sole factor to consider. Doesn't Murphy v. Sloan, though, weigh in the other direction? They say that parents' intent isn't the only factor and that in certain cases where the intent is doubtful, you can look at acclimatization as significant or more significant. It's considered, certainly, and there's a lot of discussion in Moses and it's maybe difficult to understand in the end. So in some senses, there's discussion of issues where it's not an endorsement of it. But in Moses, the subject of acclimatization, and that word is used expressly as being something that has to be found in concert with shared intent. Well, so I'm looking at this quote from Murphy, which we're also bound by, Moses isn't the only case on point, which says shared parental intent is not always dispositive. Acclimatization may change the calculus. Yes, Your Honor, it may change the calculus if you take it into consideration with all the surrounding circumstances. So I still don't believe that's an endorsement of using acclimatization alone. But here the district court didn't directly address it with respect to the daughter at all. So what do we do about that? Well, I think, as the court pointed out, that it wasn't requested that it do so. There may have been acclimatization facts that were developed in the record, but there was no instruction to the district court to use acclimatization alone in making its analysis. And it's our position that you don't need to reach acclimatization when you have sufficient evidence regarding shared intent. And here the district court found good evidence regarding shared intent. It found that because Ms. Baffo had been subjected to abuse over the course of a decade, repeatedly, by Mr. Asomato, that when she went to Canada in September 2016, which she had done multiple times before in an effort to get her son and return to the United States without abandoning the United States as her habitual residence, that when she went there in September 2016, she went there with reservations, at best for Mr. Asomato's case. So even if we assume that that was not clearly erroneous and that there was no shared intent to move both children to Canada, if we read our cases as saying acclimatization is a separate inquiry that still needs to be considered, what should we do here? Well, you would have to remand if that is the decision of the court. But the outcome would be no different with respect to the daughter. So are you saying it would be a harmless error? Assuming we thought it was error that the district court didn't address acclimatization directly, your argument is that it would be harmless here. That's correct, Your Honor. And in fact, in the Moses case, in one of the footnotes, it expressly states that where a mother was essentially trapped in a foreign jurisdiction for 10 months due to abuse and unable to return earlier, that that would not result in acclimatization. And I will get that footnote to you in just a second. I thought the acclimatization inquiry was about the child, though. So what can you point us to in the record that would tell us that even if there had been an inquiry about acclimatization as to the daughter, she would not have become acclimatized to Canada? It is footnote 31, by the way, in the Moses case. And I'm going to answer that question in one second, Your Honor. But the footnote says, and this does have to do with the habitual residence of a child. Right there, the parent and child were sort of trapped, as I recall the footnote. Right. And the same situation applies here. First of all, the mother and the daughter have always had the same habitual residence. They go together. And to correct a counsel, it wasn't four years old, it was five years. So the first five of her six years at the time that the return to the United States occurred, the daughter had lived in the United States. The first five of her six years, she had lived out of the presence of her father. For the entirety of her life, the daughter has always lived with the mother. The habitual residence of the daughter is inextricably tied to that of the mother. Now here... On this question I asked at the end before, so would the mother return to Canada if the daughter had to return to Canada? That is not my understanding, Your Honor, from everything I've heard from my client. The answer would be no. However, she hasn't been faced with having to ever be separated from her daughter. So, but that was her position. And I think it's unfair to query and make a decision based on will she go back or not. The fact is... It might relate to this harm issue though, because some case law says that if the child witnesses the parent being abused, that it harms the child. But if the parent wasn't there to be abused, it does seem like it affects that inquiry. That factor would be neutralized. But we're also relying on two others. And one is that there is harm... There is a likelihood risk of harm that occurs from the father abusing the mother. And that's dealt with very well in the amicus brief. And I refer the court to that. And the other is that there can be an intolerable situation when the son were he to be separated from his mother and his sister. And that comes from the Sarbopoulos case. Do you think that the law settled in the Ninth Circuit about that issue? No, Your Honor. I think that we're on the cusp here with respect to considering abuse of a spouse and how much it should impact the grave risk analysis. I don't deny that. However, I don't think the district court paid it sufficient and gave it sufficient weight. The district court did consider it because it discusses the evidence with respect to Asum Addo's striking Bafo. The district court says Asum Addo struck Bafo more than once. It denies that Asum Addo ever held a knife to her throat and also indicated it wasn't aimed at the children. So the district court discussed it and weighed it. But your argument is the district court should have given it more weight. Is that correct? Yeah. I think from reading the district court's opinion, I came away with, and I think this court would come away with, the clear indication that the district court felt constrained in that when it only finds evidence of abuse against the spouse, that that simply, as a matter of law, doesn't cut it and that it cannot find a grave risk with respect to the children. But when you look at the wealth of information that's in the amicus brief that suggests just the opposite, I think that it should have been given more weight and more consideration. There was the expert report saying no grave risk of harm. And there was also evidence, I guess, of the mother abusing the children. The reports in the expert report about the mother beating the children or spanking the children. There's evidence of both parents spanking the children. So that's a wash. But with respect to the... The son said the father was no longer spanking him and he was afraid of the mother, is how I read the report. That could be... We're talking about a 10-year-old boy who's been unsettled. So the import of the Stahl report, from our perspective, is one, he found evidence that there was abuse. And in fact... That the father had struck the mother. Yes. But characterized it as not being classic domestic violence situation, but they had, I don't remember exactly this wording, but difficulty not handling their communications well. Something like that. Difficulty in resolving disputes, I think was the descriptor. But important in... Isn't that what the expert said? It wasn't the, I don't remember, their classic domestic violence corrective constraint or whatever their terminology was. Yeah, it's coercion, I believe. Thank you. Let me ask you this. Your position is that you would like the son to be returned to the mother, I guess, right? That's correct, Your Honor. And just focus me on the reasons why you think that the law supports that in this case. Right. So it's our position that the law requires that there be a settled intent to abandon an old... Settled or shared intent. It's used interchangeably, I think, in the case law. Settled or shared intent by the parents to abandon a previous habitual residence in order to find habitual residence in a new place. And here there is ample evidence that the last place there was a shared intent for the son to have habitual residence was in the United States.  And he was kept there through manipulation and dominance and the exercise of physical abuse against the mother. And that's what frustrated her attempts to bring her son back earlier. So you made those arguments in the district court, and it seems the district court disagreed and made a finding that there wasn't mutual... Sorry, that the mutual intent for the son was to go to Canada and so didn't agree with these arguments in terms of the credibility of them. So do we review that under a clearly erroneous standard? You do. And what we challenged is the two primary factual findings underlying that ultimate finding of no habitual residence that the district court made. And those two underlying factual findings were clearly erroneous. One is that the district court found that the mother, Miss Baffo, agreed way back in 2010 that the son would live in Canada. And the other, which relates to I think a point that Judge Block was exploring earlier, the other finding was that the mother made no objection until the occurrence of these proceedings to the son living in Canada. And that is just simply not true. While the mother did not go to legal authorities here or in Canada, she went to what she had been taught in Ghana to go to... But the district court recited that, right? He recited her testimony regarding the Ghanaian customs and how she had followed them. I seem to remember that in the facts section of the district court's opinion. Exactly, Your Honor. He just didn't give them weight. Well, he... Well, I guess that's right. He didn't give them weight. So he acknowledged them and he accepted them. But in the end, he disregarded them in making a factual finding that she did not raise an objection prior to the occurrence of these proceedings. She did. She went to the authorities that she was supposed to go to pursuant to her custom. Let me ask you this. Are there any cases at all that address the issue of to what extent cultural norms should be a factor in assessing these issues? Not in that sense, Your Honor. But I think Moses teaches us that you were to consider all... Where in Moses does it guide us in terms of deciding whether a district court should consider the cultural aspects of a person's life? That it states that all of the circumstances of any particular case are to be considered. So this is a totality of the circumstances and your position is that the district court did not consider this in his final analysis? Correct, Your Honor. If the panel has no further questions, I'll sit down. Apparently not. Thank you. I'll be very brief. I'll take my one minute. Judge Friedman, to answer your question from earlier about argument, Miss Powers reminded me if you look at page E173 and E168, 173, 168, if there's any dubiety about the shared intent, you look to the issue of acclimatization. And why? Because if we don't look to acclimatization, we would reach absurd results. You could have a wee boy in Scotland for 14 years. 14 years. The claim is no shared intent. The child wears a kilt to school and speaks with a Scottish accent, has no connection with the United States. That's how you speak, right? That's exactly right. That's how I speak, Your Honor. But that's why our treaty, which is incredibly successful, starts by saying the interests of children under this treaty are paramount. It's about the interests of these children. That's what matters most. And that's why acclimatization, as established by Judge Kuczynski, is so important. Thank you. The case of Akwasi Demoa Asumado versus Hannah Boahema-Bafo, this is admitted both of you gentlemen are pro bono. Yes, Your Honor. We thank you very much for your service in this case. It was very helpful to the court. We appreciate it. We'll now take a five-minute recess.
judges: Ikuta, Friedland, Block